IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 08-cv-01225-RPM

LOUIS E. RIVELLI,
RODNEY B. JOHNSON,
STEPHEN G. BURKE,
TERESA W. AYERS,
CRAIG L. STEVENSON, and
ROBERT T. HOFFMAN

    Plaintiffs,

v.

TWIN CITY FIRE INSURANCE COMPANY,

    Defendant

---

ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

---

    Louis E. Rivelli, Rodney B. Johnson, Stephen G. Burke, Teresa W. Ayers, Craig L. Stevenson, and Robert T. Hoffman (collectively, "the Plaintiffs") are former officers or directors of Fischer Imaging Corporation ("Fischer"). Fischer is or was engaged in the business of designing, manufacturing and selling medical imaging systems. Fischer's common stock previously traded on the NASDAQ National Market.[1]

---

[1] "Fischer's common stock was traded on the NASDAQ National Market unit it was delisted on July 7, 2003, due to Fischer's failure to file timely reports with the SEC. On August 22, 2006, the company filed a petition under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Colorado." *See* Def.'s Ex. A-1, First Am. Compl. ¶ 14, filed May 7, 2007 [Doc. 113], in *SEC v. Rivelli, et al.,* Civil Action No. 05-cv–01039-RPM-MJW, in the United States District Court for the District of Colorado.

On June 7, 2005, the United States Securities and Exchange Commission brought a civil enforcement action against Rivelli, Johnson, Burke, Ayers, Hoffman, and Stevenson, alleging that these individuals participated in a fraudulent scheme involving improper accounting practices for the purpose of inflating Fischer's reported quarterly revenue and net income. In that action, designated as Civil Action No. 05-cv–01039-RPM-MJW ("the SEC Action"), the SEC seeks injunctive relief, disgorgement of ill-gotten gains, civil monetary penalties, pre-and post-judgment interest, and entry of an order permanently barring Rivelli, Johnson, Burke and Ayers from serving as an officer or director of any public company.

Fischer had obtained, for the benefit of itself and its officers and directors, primary and excess directors and officers liability insurance policies ("D & O policies"). Primary coverage was provided by Federal Insurance Company ("Federal"). Excess coverage was provided by Twin City Fire Insurance Company ("Twin City" or "the Defendant"). The central issue in this action is whether Twin City is obligated to continue advancing funds for the Plaintiffs' defense of the SEC Action, or whether Twin City may discontinue such funding on the basis of an exclusion set forth in a Warranty Letter incorporated in the Twin City Policy. The Plaintiffs and Twin City have filed cross motions for summary judgment addressing that issue.

The following facts are not in dispute:

Effective May 1, 2002, Federal issued Executive Protection Policy Number 8169-4079, insuring officers and directors of Fischer. ("Federal Policy," Pls.' Ex. A).[2] The Federal Policy provided, in the aggregate, $5 million in primary D & O coverage.

Effective May 1, 2002, Twin City issued its Excess Financial Products Insurance Policy, No. NDA0153589-02. ("Twin City Policy," Pls.' Ex. B). The Twin City Policy provided $5 million of excess coverage over the underlying Federal Policy.

As a "follows form" excess policy, the Twin City Policy is subject to the same warranties, terms, conditions, definitions, exclusions, and endorsements that are contained in the Federal Policy, except as otherwise provided in the Twin City Policy. (Twin City Policy, § III.A). Thus many provisions of the Federal Policy pertain to both policies.

Under the Federal Policy, "Insured Person" means any past, present or future director or officer of the Insured Organization and, in the case of a Securities Claim, any past, present or future employee. There is no dispute that the Plaintiffs are Insured Persons under the Twin City Policy.

The Federal Policy provides that the Insurer will pay "all Loss for which the Insured Person is not indemnified by the Insured Organization and which the Insured Person becomes legally obligated to pay on account of any Claim first made against him, individually or otherwise, during the Policy Period . . . for a Wrongful Act committed, attempted, or allegedly committed or attempted by such Insured Person before or during the Policy Period." (Federal

---

[2]Unless otherwise noted, exhibit references are to those exhibits submitted with the Plaintiffs' brief in support of their motion for partial summary judgment and the Defendant's response brief. Plaintiffs' exhibits are designated by letter (Pls.' Ex. A), and the Defendant's exhibits are designated by letter and number (Def.'s Ex. A-1).

Policy § 1). Under the Federal Policy, the term "Loss" means the total amount any Insured Person becomes legally obligated to pay, including Defense Costs, on account of each Claim made against them for Wrongful Acts for which coverage applies. (Federal Policy § 18, as modified by Endorsement 7). The Federal Policy provides, "it shall be the duty of the Insured Persons, and not the duty of [the Insurer] to defend Claims made against the Insured Persons." (*Id*. § 11). Defense costs are part of the limits of liability and the payment of defense costs reduces the limits of liability. (*Id*.).

The Twin City Policy at issue was a renewal of a previous Twin City policy, which had provided $2.5 million in excess coverage. As part of the renewal process, Fischer submitted to Twin City a Warranty Letter dated April 30, 2002, containing the following representation:

> No person or entity for whom this insurance is intended has any knowledge or information of any act, error, omission, fact or circumstance which may give rise to a claim which may fall within the scope of the proposed insurance detailed above.

(Final Page of Twin City Policy, Pls.' Ex. B). The "proposed insurance detailed above" refers to the additional $2.5 million – the increase over the then existing $7.5 million of primary and excess coverage. The Warranty Letter also provided:

> IT IS AGREED THAT IF SUCH KNOWLEDGE OR INFORMATION EXISTS, ANY CLAIM ARISING THEREFROM (WHETHER OR NOT DISCLOSED HEREIN), IN ADDITION TO ANY OTHER REMEDY THE INSURER MAY HAVE, IS EXCLUDED FROM THE PROPOSED COVERAGE.

(*Id*.). The Warranty Letter further stated:

> IT IS FURTHER AGREED THAT THIS LETTER SHALL BE DEEMED PART OF THE POLICY AND THE STATEMENT MADE THEREON SHALL BE DEEMED AN EXPRESS WARRANTY FOR ALL INSUREDS WHICH HAS BEEN RELIED UPON BY THE INSURER PURSUANT TO THE ISSUANCE OF THIS COVERAGE.

(*Id*.).

In April, 2003, Fischer announced that it was delaying the filing of its Form 10-K for 2002, and would likely restate certain of its previously issued financial statements from 2000 through the third quarter of 2002. Shortly after that announcement, private securities class actions were filed against Fischer and certain of its officers and directors. Fischer also became the subject of an SEC investigation. Fischer provided appropriate notice of these matters to both Federal and Twin City.

In October, 2003, Federal provided a coverage letter to Rivelli's counsel, stating that it would provide coverage for the class action suits, subject to reservations of rights. (Ex. E to Def.'s Br. in Resp. to Pls.' Mot. for Prelim. Inj. [Doc. 11-7]). Twin City adopted the essence of Federal's reservations of rights and reserved its rights to conduct its own independent investigation to determine whether rescission of the entire policy was appropriate or whether the exclusion in the Warranty Letter would preclude coverage for the top $2.5 million.[3]

The private securities class actions proceeded as one suit, *Sorkin LLC v. Fischer Imaging Corporation, et al.*, Civil Action No. 03-cv-00631-RPM, in the United States District Court for the District of Colorado. That action was dismissed on June 21, 2005, on the ground that the amended class action complaint failed to meet the pleading standards applicable to private securities class actions. The *Sorkin* suit was not refiled after it was dismissed.

---

[3]The source of this statement is pages 8-9 of Twin City's brief [Doc. 11] in response to Plaintiffs' Motion for Preliminary Injunction.

On November 15, 2004, the SEC entered a Cease and Desist Order against Fischer, pursuant to a Settlement Agreement between Fischer and the SEC. (Ex. D to Pls.'s Br. in Supp. of Mot. for Prelim. Inj. [Doc. 3-8]).

On June 7, 2005, the SEC brought the enforcement action described above against Rivelli, Johnson, Burke, Ayers, Stevenson, and Hoffman.

By letter dated July 18, 2005, Federal stated that it would provide coverage for the SEC Complaint subject to the Policy terms and provisions and the reservations contained herein." (Pls.' Ex. F). By letters dated July 6, 2005 and August 3, 2005, Twin City set forth its coverage position with respect to the SEC Action. (Pls.' Exs. D and E). In its August 3, 2005 letter, Twin City stated, "Because the Twin City Policy, except to the extent that it provides otherwise, is generally subject to the same terms and conditions that are contained in the primary policy, Twin City adopts the views set forth in Federal's July 18, 2005 letter as its own and hereby reserves all of its rights and defenses under the Policy and at law . . . . Twin City also continues to reserve all of its rights and defenses in connection with the SEC Action in accordance with prior correspondence in this matter." (Pls.' Ex. E).

Between 2003 and 2007, Federal paid defense costs and other authorized sums on behalf of the Plaintiffs and other insureds. The limits of the Federal Policy were exhausted on or about December 6, 2007.

In a letter dated November 28, 2007, Twin City's counsel notified the Plaintiffs' counsel as follows:

> It is our understanding that the limits of liability of the primary policy will soon be exhausted by the payment of defense costs. Upon such exhaustion, Twin City's Policy will continue in force as Primary Insurance, subject to its terms, conditions and exclusions. Subject to a full reservation of its rights and defenses, Twin City

> will pay reasonable Defense Costs up to $2.5 million in excess of the primary policy's limit of liability of $5 million. Based on the information received to date and the provisions of the Warranty Letter, however, Twin City will decline to pay any liability incurred by the defendants in excess of $7.5 million.

(Pls.' Ex. G). The author referred to documents and deposition testimony produced in the SEC Action to support Twin City's position.

Twin City has paid $2.5 million in costs and expenses associated with the defense of the SEC Action.

The Plaintiffs commenced this suit against Twin City on June 10, 2008, seeking (1) a declaratory judgment that Twin City is obligated to pay the Plaintiffs' losses incurred in defending the SEC Action up to the policy limit of $5 million; (2) damages for breach of contract; (3) damages for insurance bad faith, and (4) damages for violation of the Colorado Consumer Protection Act. Federal jurisdiction is provided by 28 U.S.C. § 1332, based on complete diversity of citizenship between the Plaintiffs and the Defendant. The parties agree that the substantive law to be applied is the law of Colorado.

Twin City responded to the Complaint by moving pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Plaintiffs' fourth claim for violation of the Colorado Consumer Protection Act and answering the remaining allegations. The Defendant's motion to dismiss the fourth claim was granted during a hearing held on October 10, 2008.

The Plaintiffs filed a motion for a preliminary injunction to compel Twin City to continue funding the defense of the SEC Action.

On October 22, 2008, the Plaintiffs moved pursuant to Fed. R. Civ. P. 56(c), for partial summary judgment on their first claim for relief. The Defendant responded to that motion and filed a cross motion for summary judgment on November 5, 2008.

A hearing on the pending motions was held on November 7, 2008. The Plaintiffs' motion for preliminary injunction was denied. The Court announced that it would deny the Plaintiffs' motion for partial summary judgment and grant the Defendant's cross motion for summary judgment by a written order to be entered. This is that order.

In coverage disputes, the insured has the burden of proving that an asserted claim comes within the coverage of the policy, and the insurer has the burden of proving that the facts fall within the policy's exclusions. *See Hecla Mining Co. v. N.H. Ins. Co.,* 811 P.2d 1083, 1090 (Colo. 1991).

Twin City does not dispute that the claims asserted by the SEC fall within the coverage provided by the Twin City Policy. The issue is whether the exclusion set forth in the Warranty Letter applies to exclude the "top" $2.5 million of coverage, thereby relieving Twin City of any obligation to pay additional defense costs.

The duty to defend is distinct from and broader than the duty to indemnify. *Hecla Mining Co.*, 811 P.2d at 1089. Under Colorado law, the duty to defend is to be determined solely from the complaint in the underlying action:

> An insurer's duty to defend arises when the underlying complaint against the insurer alleges any facts that might fall within the coverage of the policy. The actual liability of the insured to the claimant is not the criterion which places upon the insurance company the obligation to defend. Rather, the obligation to defend arises from allegations in the complaint, which if sustained, would impose a liability covered by the policy. Where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim.

*Hecla Mining Co.,* 811 P.2d at 1089 (citation, footnote, brackets and internal quotation marks omitted); s*ee also Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 828 (Colo. 2004); *Pompa v. Am. Family Mut. Ins. Co.*, 520 F.3d 1139, 1146 (10th Cir. 2008).

"The insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy. An insurer is not excused from its duty to defend unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 614 (Colo. 1999). The insurer bears the burden of establishing that the allegations of the underlying complaint are solely and entirely within the exclusions of the insurance policy. *Cotter Corp.*, 90 P.3d at 829.

Under Colorado law, the applicability of the Warranty Letter's exclusion must be determined based on the "four corners" of the SEC's Complaint and Amended Complaint, without resort to extrinsic evidence.

Both the original Complaint and the SEC's Amended Complaint, filed May 6, 2008, allege that the defendants (the Plaintiffs here) directed or participated in a fraudulent scheme involving the improper recognition of revenue for sales transactions having contingent terms contained in side letters that were not disclosed to Fischer's accounting department or outside auditors, and the improper recognition of revenue for sales of equipment shipped to and stored in a Fischer-controlled warehouse. The SEC's Amended Complaint asserts seven claims for relief: (1) violations of Section 17(a)(1) of the Securities Act; (2) violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act; (3) violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5; (4) falsification of books and records, in violation of Section 13(b)(5) of the

Securities Exchange Act and Rule 13b2-1; (5) deceit of auditors in violation of Exchange Act Rule 13b2-2; (6) aiding and abetting Fischer's filing of misleading SEC reports, in violation of Section 13(a) of the Securities Exchange Act and related rules, and (7) aiding and abetting Fischer's failure to maintain accurate books and records, in violation of Section 13(b)(2) of the Securities Exchange Act.

The Plaintiffs argue that language in the Colorado Supreme Court's opinion in *Hecla Mining* limits Twin City to two options: (1) continue paying the Plaintiffs' defense costs (up to the policy limit of $5 million) under a reservation of rights, or (2) file a declaratory judgment action after the SEC Action has been adjudicated.

An insurer who disputes its contractual obligation is not limited to those two options. An insurer may disclaim a duty to defend or pay for defense costs when the insurer correctly concludes that the policy does not impose such a duty. *See, e.g., Thompson v. Maryland Casualty Company,* 84 P.3d 496 (Colo. 2004).

Review of the terms of the Warranty Letter and the SEC's complaints compels the conclusion that the SEC's allegations are within the exclusion of claims arising from an "act, error, omission, fact, or circumstance" of which an insured person had prior knowledge. The word "claim" as used in the Warranty Letter is broader than a single claim for relief and encompasses the following:

(i) a written demand for monetary damages or non-monetary relief;
(ii) a civil proceeding commenced by the service of a complaint or similar pleading;
(iii) a criminal proceeding commenced by the service of an indictment; or
(iv) a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

against any Insured Person for a Wrongful Act or Interrelated Wrongful Act, including any appeal therefrom.

(Federal Policy, § 18, as modified by Endorsement No. 7). The Policy definitions apply to the Warranty Letter, which is part of the Policy.

The Warranty Letter explicitly states that the exclusion is non-severable. That is, if – at the time the Warranty Letter was signed – any insured person had knowledge of "any act, error, omission, fact, or circumstance" that would give rise to a claim, the top $2.5 million of coverage is affected for all insured persons, even those without such personal knowledge. Accordingly, if any of the Plaintiffs had such knowledge, all of them are within the exclusion.

The Plaintiffs' roles at Fischer as of May 1, 2002 are important to the analysis. Rivelli became Fischer's Chief Operations Officer in September 1999. Rivelli became Fischer's Chief Executive Officer ("CEO") in December 2000, and served as Fischer's CEO and President from December 2000 until his departure from Fischer in April 2002.[4] Johnson served as Fischer's Chief Financial Officer ("CFO"), vice president of finance, and secretary from August 2000, until his departure from Fischer in October 2002. Burke served as a consultant to Fischer's Board of Directors from March 2002 through October 2002. In October 2002, Burke replaced Johnson as Fischer's CFO, executive vice president of finance, and secretary. Burke served in those positions from October 2002 to January 2004. Ayers joined Fischer's Board of Directors

---

[4] After Rivelli's departure in April 2002, Gerald Knudson became Fischer's CEO. Knudson was not named as defendant in the SEC Action.

in April 2002, and served as a director until approximately September 2003. Ayers served as chair of Fischer's Audit Committee from April 2002 to March 2003. Stevenson was a Vice-President of Sales and product manager at Fischer during the relevant time period. Hoffman was a regional sales manager, national sales manager and/or Vice-President of Sales at Fischer during the relevant time period.

The SEC's Amended Complaint alleges, *inter alia*:

- "Beginning at least as early as January 1, 2000 and continuing through the filing of Fischer's report on Form 10-Q for the quarter ended September 29, 2002, the Defendants carried out a scheme to fraudulently inflate Fischer's reported quarterly revenue and net income by recognizing revenue on equipment as to which customers had not yet agreed to accept delivery, and on transactions as to which there were material contingencies, including rights of return." (SEC Am. Compl. ¶ 30).

- "Rivelli was aware that when Fischer shipped orders before customers agreed to take delivery of the products, Fischer shipped them to warehouses controlled and paid for by Fischer. Rivelli was notified of specific orders Fischer was holding in storage when he received emails from a Fischer employee with lists of orders that had been shipped to Fischer controlled storage facilities. In a March 2002 email, Rivelli acknowledged that, over the preceding three years, Fischer almost always had twelve or more systems in storage and paid the storage costs for all but two orders. Moreover, Rivelli was personally involved in transactions as to which he knew or was reckless in not knowing that Fischer improperly recognized revenue, where the customers had not agreed to take delivery of the equipment and Fischer shipped the equipment to a storage facility." (*Id.* ¶ 39).

- "Rivelli knew that in May 2001 EPMed [one of the putative buyers of Fischer's products] did not provide a requested delivery date or location because it had not yet entered into an agreement with a customer to buy the system or even identified what customer would buy it. Rivelli also knew that Fischer was responsible for delivering the system directly to EPMed's customer when the customer requested delivery because EPMed never intended to take physical delivery of the equipment. Rivelli directed that Fischer ship this equipment to a Fischer controlled storage facility in May 2001 and Fischer recognized approximately $532,000 of revenue on the equipment, which accounted for about 31% of Fischer's net income for the quarter." (*Id.* ¶ 40).

- "Between January 2000 and September 2002, Rivelli and Johnson were both aware of side agreements and backdated sales orders related to purported sales on which Fischer improperly recognized revenue. Rivelli and Johnson never provided any of the side agreements to Fischer's independent auditors and never disclosed any side agreements or backdated sales orders to Fischer's independent auditors." (*Id.* ¶ 62).

- "Rivelli, Johnson, Burke, and Ayers each met with Fischer's external auditors in connection with their reviews or audits of Fischer's financial statements and discussed accounting and reporting issues, including Fischer's revenue recognition practices. Rivelli, Johnson, Burke and Ayers knew that Fischer recognized revenue when it shipped equipment to Fischer controlled warehouses and omitted to state this material fact to Fischer's external auditors." (*Id.* ¶ 63).

- "Moreover, during their tenures at Fischer, Rivelli and Johnson directed a scheme to conceal contingencies and to obtain false and misleading documents after the end of every quarter in order to hide Fischer's fraudulent revenue recognition from Fischer's auditors. Several of Fischer's employees termed the time between the end of each quarter and the date on which Fischer's auditors arrived to perform audits or quarterly reviews the 'clean up period.' During the 'clean up period,' Rivelli and Johnson directed Fischer employees to 'clear' contingencies that were unresolved at the end of the quarter. If sales documents referenced contingencies, Rivelli and Johnson directed Fischer employees to 'clean them up' by obtaining purchase orders or sales contracts which did not reference the contingencies that were in effect. Further, in circumstances where customers had originally submitted purchase orders or sales contracts that contained FOB Destination terms, Rivelli and Johnson directed Fischer personnel to obtain sales documentation with false FOB Factory terms. Through their involvement in Fischer's 'clean up' period, Rivelli and Johnson knew about, personally directed, and participated in, Fischer's concealment of contingencies and other material facts from Fischer's auditors and Fischer's creation and provision to the auditors of false and misleading documents." (*Id.* ¶ 68).

- "Stevenson and Hoffman used side letters to deceive Fischer's accountants and Fischer's external auditors. Stevenson withheld and failed to disclose side letters to Fischer's sales administrator and accounting department when he knew or was reckless in not knowing that the terms contained in the side agreements made it improper for Fischer to recognize revenue. Stevenson also hid side agreements because he knew that if Fischer's external auditors were aware of them, Fischer would not be permitted to recognize revenue from the transactions. On at least one occasion, Stevenson contracted with

>   a customer to keep the existence of a contingency contained in a side letter secret to prevent Fischer's auditors from finding out about it. On at least one occasion, Hoffman failed to disclose a side letter to Fischer's sales administrator and accounting department when he knew or was reckless in not knowing that it was wrong for Fischer to recognize revenue from the transaction as a result of the terms contained in the side agreement. Hoffman knew that when he did provide side agreements to Fischer's sales administrator, they were not provided to Fischer's external auditors because the auditors would not allow Fischer to recognize revenue from the transactions if they were aware of the terms contained in the side agreements." (*Id.* ¶ 72).
>
> •   "Rivelli, Johnson, Burke, Ayers, Stevenson, and Hoffman aided and abetted Fischer's violations of the books and records provisions of the federal securities laws because they knowingly or recklessly caused Fischer's books and records to be falsified. Each individual knew about and participated in Fischer's recognition of revenue from orders shipped to warehouses controlled by Fischer." (*Id.* ¶ 75.)

These allegations and others, when read together, show that Rivelli and Johnson knew of wrongful activities at Fischer that could give rise to a claim under the Twin City Policy before May 1, 2002.

The Plaintiffs argue that an insurer seeking to deny coverage based on a prior knowledge exclusion must show both that an officer or director knew of facts related to acts, errors, or omissions taking place before the effective date of the policy, and that the director or officer with such knowledge appreciated that those facts could give rise to a claim under the policy. The Plaintiffs argue that the subjective nature of this inquiry precludes summary judgment in favor of Twin City. Asserting that mere negligence could support liability on at least one claim alleged by the SEC, the Plaintiffs argue that merely negligent conduct would not implicate the Warranty Letter's exclusion. At the hearing held on November 7, 2008, Rivelli's counsel posited that Rivelli's knowledge of the contingent nature of particular sales transactions and his knowledge about the timing of Fischer's revenue recognition were not sufficient to trigger the Warranty

-14-

Letter's exclusion, because Rivelli could have failed to appreciate the wrongful nature of Fischer's accounting practices.

This argument is unavailing because it ignores basic information that a CEO and CFO of a publicly traded company must know. Anyone holding those positions could not fail to appreciate the potential for liability created by activities such as recognizing income on transactions having contingencies due to disguised side agreements, or recognizing income on products held in a company-controlled warehouse, while the company paid for the storage costs. All of the claims set forth in the SEC's Amended Complaint arise from and incorporate those factual allegations. The applicability of the Warranty Letter cannot be avoided simply because the scienter element for some claims for relief could be satisfied by recklessness or even negligence.

Finally, the Plaintiffs contend that Twin City is estopped from relying on the Warranty Letter's Exclusion, pointing out that Twin City initially stated that it would defend under a reservation of rights and then invoked the exclusion in November 2007, after the SEC Action had been proceeding for more than two years. This argument is without merit. Under Colorado law, the doctrines of waiver and estoppel cannot be used to create coverage where none previously existed under the terms of the policy. *See Compass Ins. Co.*, 984 P.2d at 620 (citing *Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 764 P.2d 1191, 1198 (Colo.1988); *Hartford Live Stock Ins. Co. v. Phillips*, 150 Colo. 349, 352, 372 P.2d 740, 742 (1962)).

For the reasons set forth above, the Warranty Letter exclusion precludes coverage of defense costs as to the SEC Action for the second $2.5 million of the $5 million liability limit

provided in the Twin City Policy.  Accordingly, Twin City has no obligation to pay additional costs and expenses for the Plaintiffs' defense of the SEC Action.

The motions for summary judgment have been considered only as to the Plaintiffs' first claim for relief.  The remaining claims are not dependent on the exclusion of coverage issue.  Due to the importance of this issue to the SEC enforcement action and its severability from the remaining claims, there is no just reason for delay in the entry of a final judgment dismissing the first claim for relief, making it appealable under Fed.R.Civ.P. 54(b).

It is now

ORDERED that the Plaintiffs' Motion for Partial Summary Judgment is denied, and it is

FURTHER ORDERED that the Defendant's Motion for Summary Judgment is granted for dismissal of the Plaintiffs' First Claim for Relief.  It is

FURTHER ORDERED that the Clerk will enter a Final Judgment dismissing the Plaintiffs' First Claim for Relief pursuant to Fed. R. Civ. P. 54(b).

Dated:  November 21, 2008

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge